PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 09-2292, 09-2299, 09-2300,
09-2301, and 09-2302
_____

UNITED STATES OF AMERICA

v.

ELJVIR DUKA,
Appellant in 09-2292
_____

UNITED STATES OF AMERICA

v.

MOHAMAD IBRAHIM SHNEWER,
Appellant in 09-2299
_____

UNITED STATES OF AMERICA

v.

DRITAN DUKA
a/k/a DISTAN DUKA
a/k/a TONY DUKA

a/k/a ANTHONY DUKA

Dritan Duka,
Appellant in 09-2300
_____

UNITED STATES OF AMERICA

v.

SHAIN DUKA,
Appellant in 09-2301
_____

UNITED STATES OF AMERICA

v.

SERDAR TATAR,
Appellant 09-2302
_____

Appeals from the United States District Court
for the District of New Jersey
(D.C. Criminal Nos. 1-07-cr-00459-001 through 005)
District Judge: Honorable Robert B. Kugler

_____

Argued on May 23, 2011
Before:  McKEE, Chief Judge,
SCIRICA and RENDELL, Circuit Judges.

(Opinion Filed December 28, 2011)

———————

Troy A. Archie, Esq.    **[ARGUED]**
The Elegance Building, Suite A
116 North Third Street
Camden, NJ  08102
  *Counsel for Appellant Eljvir Duka*

Rocco C. Cipparone, Jr., Esq.    **[ARGUED]**
205 Black Horse Pike
Haddon Heights, NJ  08035
  *Counsel for Appellant Mohamad Ibrahim Shnewer*

Michael N. Huff, Esq.    **[ARGUED]**
1333 Race Street
Philadelphia, PA  19107
  *Counsel for Appellant Dritan Duka*

Michael E. Riley, Esq.    **[ARGUED]**
100 High Street, Suite 302
The Washington House
Mount Holly, NJ  08060
  *Counsel for Appellant Shain Duka*

Richard Sparaco, Esq.    **[ARGUED]**
1920 Fairfax Avenue
Cherry Hill, NJ  08003
  *Counsel for Appellant Serdar Tatar*

Mark E. Coyne, Esq.
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ  07102

Norman Gross, Esq.    **[ARGUED]**
Office of United States Attorney
Camden Federal Building & Courthouse
401 Market Street, 4th Floor
Camden, NJ  08101
  *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

RENDELL, *Circuit Judge*.

In this consolidated appeal, defendants Mohamad Shnewer, Dritan Duka, Eljvir Duka, Shain Duka, and Serdar Tatar appeal various aspects of the convictions and sentences they received after a high-profile, two-and-a-half-month jury trial concerning a plot to attack United States military bases in New Jersey, Pennsylvania, and Delaware, particularly the United States Army Base at Fort Dix. The government presented extensive evidence of the plot, including: dozens of recorded conversations among defendants and two confidential informants discussing violent jihad and plans to stage an attack; weeks of testimony from the government's confidential informants and the law enforcement agents who coordinated the government's sixteen-month investigation; videos of defendants' "training" trips in the Poconos, where they engaged in target practice; propaganda videos advocating violent jihad, including attacks against American service members, which defendants viewed and discussed; and video surveillance of a transaction in which two defendants purchased automatic and semi-automatic weapons for use in an attack. All defendants were convicted of

4

conspiring to murder United States military personnel in violation of 18 U.S.C. §§ 1114 and 1117. Four of the five defendants were also convicted of various firearm offenses.

Defendants raise numerous arguments on appeal. Most significantly, they urge that (1) their convictions should be reversed because they were based in part on evidence procured under a purportedly unconstitutional provision of the Foreign Intelligence Surveillance Act (FISA) and (2) the District Court improperly admitted certain out-of-court statements against Serdar Tatar under the coconspirator exception to the hearsay rule. In a joint, counseled brief and individual briefs that we permitted them to file *pro se*, defendants also raise a number of evidentiary and other issues concerning the conduct of their trial. Because we conclude that their arguments lack merit and that Judge Kugler managed this extraordinarily complex trial in an exemplary way, we will affirm the District Court's judgments as to the conspiracy and most of the firearm offenses. For reasons we discuss in more detail below, we will vacate Mohamed Shnewer's conviction on Count 4, attempted possession of firearms in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A).

## I.

Shnewer, the Duka brothers, and Tatar are a group of young men who lived in New Jersey and developed an interest in violent jihad, particularly attacks against the United States military. Defendants, who had known each other since high school, came to the FBI's attention after it received a copy of a video that was brought to a Circuit City store in Mt. Laurel, New Jersey, for copying. The video dated from January 2006 and depicted the five defendants and others at a

5

firing range in the Pocono Mountains, shooting weapons and shouting "Allah Akbar!" and "jihad in the States."

Over the course of the next sixteen months, the FBI deployed two cooperating witnesses, Mahmoud Omar and Besnik Bakalli, to monitor defendants' activities. The evidence presented at trial showed that, between January 2006 and May 2007, defendants viewed and shared videos of violent jihadist activities, including beheadings, around the world; they viewed and shared videos of lectures advocating violent jihad against non-Muslims; they sought to acquire numerous weapons, including automatic firearms and rocket-propelled grenades; they returned to the Poconos, where they again engaged in shooting practice; they discussed plans to attack the United States military; they conducted research and surveillance on various potential targets for such an attack in New Jersey, Pennsylvania, and Delaware; and they procured a map of the United States Army Base at Fort Dix to use in planning and coordinating such an attack.

With respect to the individual defendants, the evidence demonstrated the following:

Mohamed Shnewer is a naturalized American citizen who was born in Jordan. He admired and sought to emulate the "nineteen brothers," i.e., the September 11 hijackers, Osama bin Laden, and the leader of al Qaeda in Iraq, Abu Musab al-Zarqawi. Shnewer openly discussed and planned attacks on military targets in New Jersey, Pennsylvania, and Delaware. Along with Omar, the government informant, he staked out the United States Army Base at Fort Dix, McGuire Air Force Base, Lakehurst Naval Air Station, and the United States Army Base at Fort Monmouth in New Jersey; the United States Coast Guard Base in Philadelphia,

Pennsylvania; and Dover Air Force Base in Delaware. Shnewer also considered attacking the federal government building at 6th and Arch Streets in Philadelphia and drove by the building to determine whether such an attack would be feasible. To accomplish an attack on these targets, Shnewer proposed deploying a gas tanker truck as a bomb, using roadside bombs or surface-to-air missiles, and spraying military targets with machinegun fire. He sought to acquire AK-47 machineguns from Omar to use in such an attack.

Dritan, Shain, and Eljvir Duka are brothers who were born in Albania. During the events that were the subject of the trial, they were in the United States illegally. In 2006 and 2007, the Dukas took at least two trips to the Poconos to train for jihad by firing weapons, attempting to buy automatic weapons, discussing jihad, and watching violent jihadist videos. The Dukas befriended government informant Bakalli, a fellow Albanian, and encouraged him to join them in avenging Muslims who had been oppressed by the United States and Israel. They viewed and praised a lecture, *Constants on the Path to Jihad*, by Anwar al-Awlaki, the prominent cleric and proponent of attacks against the United States military, and videos depicting attacks on American soldiers by violent jihadists in Iraq and elsewhere. In recorded conversations presented at trial, the Dukas described beheadings depicted in the videos as just punishment for traitors. The Dukas watched the beheading videos over and over again until they became inured to the spectacle. Dritan told Bakalli that, although at first he "couldn't take it," "[n]ow I see it and it's nothing, I do not care. I saw hundreds being beheaded." Similarly, Eljvir told Bakalli that the beheadings were difficult to watch at first, but that "[n]ow we can watch it no problem."

7

Like Shnewer, the Dukas sought to acquire firearms to further their plans. They could not acquire weapons lawfully because they were in the country illegally, so they turned to the black market. By January 2007, the three brothers told Bakalli they had acquired a shotgun, two semi-automatic rifles, and a pistol, and they continued to look for opportunities to buy machineguns.

Later that spring, Dritan Duka ordered nine fully automatic weapons — AK-47s and M-16s — from a contact of Omar's in Baltimore. The FBI arranged a controlled transaction, and, on May 7, 2007, Dritan and Shain Duka went to Omar's apartment to retrieve their weapons. After handing Omar $1,400 in cash, Dritan and Shain examined and handled four fully automatic machineguns and three semi-automatic assault rifles. They asked Omar for garbage bags to conceal the weapons (so they would look like golf clubs) as they carried them out to the car. Before they could get there, however, federal and state law enforcement officers entered Omar's apartment and arrested them. The entire transaction was captured on video by equipment installed in Omar's apartment by the FBI and was shown to the jury at trial.

Serdar Tatar is a lawful permanent resident in the United States who was born in Turkey. Tatar appears in the video of defendants' January 2006 training trip to the Poconos. After extensive discussions with Omar about Shnewer's plan to attack Fort Dix, Tatar agreed to help by providing Omar with a map of Fort Dix to use in planning such an attack. Regarding the overall plan to attack Fort Dix, Tatar told Omar in a recorded conversation, "I'm in, honestly, I'm in."

All five defendants were arrested on May 7, 2007, after Dritan and Shain Duka completed the controlled firearm purchase from Omar. A superseding indictment, filed on January 15, 2008, charged defendants with:

- **Count 1:** conspiracy to murder members of the United States military, in violation of 18 U.S.C. §§ 1114 & 1117 (all defendants);

- **Count 2:** attempt to murder members of the United States military, in violation of 18 U.S.C. § 1114 (all defendants);

- **Count 3:** possession or attempted possession of firearms in furtherance of a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(B)(ii) (Dritan, Eljvir, and Shain Duka);

- **Count 4:** attempted possession of firearms in furtherance of a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(c)(1)(B)(ii) (Shnewer);

- **Count 5:** possession of machineguns in violation of 18 U.S.C. § 922(o) (Dritan and Shain Duka); and

- **Counts 6 and 7:** possession of firearms by an illegal alien in violation of 18 U.S.C. § 922(g)(5) (Dritan and Shain Duka (2 counts); Eljvir Duka (1 count)).

Defendants pleaded not guilty to all charges. After a two-and-a-half-month jury trial, they were convicted and sentenced as follows:

| Defendant | Convictions | Sentence[1] |
|---|---|---|
| Shnewer | • Conspiracy to murder members of the U.S. military | • Life |
| | • Attempted possession of firearms in furtherance of a crime of violence | • 360 months, to run consecutively |

---

[1] Unless otherwise noted, sentences on different counts run concurrently with one another.

| Defendant | Convictions | Sentence[1] |
|---|---|---|
| Dritan Duka | • Conspiracy to murder members of the U.S. military | • Life |
| | • Possession or attempted possession of firearms in furtherance of a crime of violence | • 360 months, to run consecutively |
| | • Possession of machineguns | • 120 months |
| | • Possession of firearms by an illegal alien (two counts) | • 120 months for each count |
| Eljvir Duka | • Conspiracy to murder members of the U.S. military | • Life |
| | • Possession of firearms by an illegal alien (one count) | • 120 months |

| Defendant | Convictions | Sentence[1] |
|---|---|---|
| Shain Duka | • Conspiracy to murder members of the U.S. military | • Life |
| | • Possession or attempted possession of firearms in furtherance of a crime of violence | • 360 months, to run consecutively |
| | • Possession of machineguns | • 120 months |
| | • Possession of firearms by an illegal alien (two counts) | • 120 months on each count |
| Tatar | • Conspiracy to murder members of the U.S. military | • 396 months |

Defendants timely appealed the judgments entered against them. We have jurisdiction to review their convictions and sentences under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, respectively.

## II.

### A. Defendants' FISA Challenge

Defendants challenge their convictions on the ground that the government's case was tainted by its reliance on evidence procured pursuant to the Foreign Intelligence Surveillance Act, or FISA, 50 U.S.C. § 1801 *et seq.*, as amended by the 2001 Patriot Act.[2] The Patriot Act revised a provision of FISA, 18 U.S.C. § 1804, to require a national security officer to certify that "a significant purpose," rather than "the purpose," of surveillance the officer seeks to conduct under FISA is "to obtain foreign intelligence information." *Compare* 50 U.S.C. § 1804(a)(6)(B) (2008) *with* 50 U.S.C. § 1804(a)(7)(B) (2000). Before the Patriot Act amendment, courts routinely interpreted that provision to require certification that foreign intelligence collection was the "primary purpose" of a FISA search. *See, e.g.*, *United States v. Duggan*, 743 F.2d 59, 77 (2d Cir. 1984) ("The requirement that foreign intelligence information be the primary objective of the surveillance is plain . . . from the requirements in § 1804 as to what the application must contain.").

Defendants contend that FISA, as amended by the Patriot Act, violates the Fourth Amendment in two ways. They urge that FISA's post-Patriot Act "significant purpose" test does not appropriately balance individual privacy interests against the government's interests in foreign

---

[2] The Patriot Act's full name is the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001).

intelligence gathering and, therefore, is unreasonable under the Fourth Amendment. Defendants also argue that FISA unconstitutionally authorizes the government to conduct searches for criminal prosecution purposes that do not satisfy typical Fourth Amendment requirements. Most significantly, they complain that "[t]he requirements under FISA do not include probable cause of a crime being committed."[3] Appellants' Opening Br. 58.

Defendants maintain that we must reverse their convictions because the government used unlawful FISA-

---

[3] Defendants also briefly assert that FISA does not satisfy the Fourth Amendment's neutral magistrate, notification, and particularity requirements. We agree with the Foreign Intelligence Surveillance Court of Review that these arguments do not preclude a determination that amended FISA is constitutional. *See In re Sealed Case*, 310 F.3d 717, 738 (Foreign Intel. Surv. Ct. Rev. 2002) (per curiam) ("[T]here is no dispute that a FISA judge satisfies the Fourth Amendment's requirement of a 'neutral and detached magistrate.'"); *see also id.* at 739-40 (under FISA, executive officers must identify with particularity the type of foreign intelligence information sought and facts establishing probable cause to believe that facilities or places at which surveillance is directed are being used, or are about to be used, by a foreign power and that the target of the surveillance is a foreign power or an agent of a foreign power); *id.* at 741 (FISA requires notice to defendant that evidence obtained through FISA surveillance will be used in a criminal proceeding).

derived evidence throughout the trial;[4] the FISA-derived evidence resulted in their convictions; and, without that evidence, the government cannot prove the charges against them.

Aligning with all of the other courts of appeals that have considered this issue, however, we reject defendants' constitutional challenge. We conclude that FISA's amended "significant purpose" requirement is reasonable under the Fourth Amendment, and, therefore, that the government's use of FISA-derived evidence in its case against defendants was lawful. We also observe that, even if we were to hold the statute unconstitutional, defendants still would not be entitled to have their convictions reversed. Defendants' argument for reversal depends on the assumption that, if FISA is declared unconstitutional, then the exclusionary rule would preclude

---

[4] The scope and nature of the FISA-derived evidence presented at trial appear to be limited. Defendants do not identify which specific pieces of evidence were obtained through FISA surveillance, but the government informed us in its brief that, of all the evidence presented at trial, only two recorded conversations were obtained through FISA surveillance. On the eve of oral argument, the government notified us that it also presented several FISA-derived photographs at trial. Assuming the government now has provided us with a complete accounting of the FISA-derived evidence used in the case, we conclude that it was *de minimis*, both in terms of the overall volume of evidence presented at the trial and of its probative value. Because we cannot be certain that the government has identified all of the FISA-derived evidence it used, however, we do not base our disposition on this conclusion.

15

the use of FISA-derived evidence in their case. Not so. Where, as here, the challenged search was conducted in objectively reasonable reliance on a duly authorized statute, the Supreme Court has held that the exclusionary rule does not preclude the admission of the fruits of the search.[5]

## 1. FISA and the Fourth Amendment

### a. Statutory Background and Structure

FISA, as originally enacted in 1978, empowered the Chief Justice of the United States to establish a special court (now known as the FISA court), staffed by district court judges, with "jurisdiction to hear applications for and grant orders approving electronic surveillance" related to foreign intelligence. 50 U.S.C. § 1803. As relevant here,

> [FISA] authorizes a judge on the FISA court to grant an application for an order approving electronic surveillance to "obtain foreign intelligence information" if "there is probable cause to believe

---

[5] Although the challenged evidence would stand even if FISA was unconstitutional, we have nevertheless undertaken a thorough analysis of the defendants' Fourth Amendment claim because of the importance of the issues it raises. *See United States v. Leon*, 468 U.S. 897, 924 (1984) ("If the resolution of a particular Fourth Amendment question is necessary to guide future action by law enforcement officers . . . , nothing will prevent reviewing courts from deciding that question before turning to the good faith issue.").

16

> that . . . the target of the electronic
> surveillance is a foreign power or
> an agent of a foreign power," and
> that "each of the facilities or
> places at which the surveillance is
> directed is being used, or is about
> to be used, by a foreign power or
> an agent of a foreign power."

*In re Sealed Case*, 310 F.3d 717, 722 (Foreign Intel. Surv. Ct. Rev. 2002) (per curiam) (quoting 50 U.S.C. § 1805(a)(3)). Among other things, the statute defines a "foreign power" as "a group engaged in international terrorism or activities in preparation therefor," 50 U.S.C. § 1801(a)(4), and an "agent of a foreign power" as (a) a non-"United States person" (i.e., non-U.S. citizen or lawful permanent resident) who "engages in international terrorism or activities in preparation therefore [*sic*]," *id.* § 1081(b)(1)(C); *see also id.* § 1801(i) (defining "United States person"), or (b) "any person" who "knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power," *id.* § 1801(b)(2)(C), (i).[6]

The relevant provision in this case, 50 U.S.C. § 1804, "sets forth the elements of an application for [such] an order." *Sealed Case*, 310 F.3d at 723. The original version of § 1804 "required a national security official in the Executive Branch — typically the Director of the FBI — to certify that 'the purpose' of the surveillance is to obtain foreign

---

[6] On appeal, defendants do not argue that the government failed to satisfy these statutory requirements or assert any procedural irregularity in obtaining or executing the FISA orders that generated the evidence used in this case.

intelligence information." *Id.* (quoting former 50 U.S.C. § 1804(a)(7)(B)). In 2001, as part of the Patriot Act, Congress revised that requirement so that it now requires the official to certify "that a *significant* purpose of the surveillance is to obtain foreign intelligence information." 50 U.S.C. § 1804(a)(6)(B) (emphasis added).

### b. The Fourth Amendment's Reasonableness Requirement

At its most basic level, defendants' argument is that FISA's "significant purpose" standard is unconstitutional because it allows the government to conduct electronic surveillance upon a lesser showing than the ordinary criminal requirement that searches conducted pursuant to a warrant must be supported by a reasonable belief that the target of the search has committed, or is about to commit, a crime. *See Berger v. New York*, 388 U.S. 41, 55 (1967) ("Probable cause under the Fourth Amendment exists where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed."); *see also* Appellants' Joint Opening Br. 58-59 (citing and quoting *Berger* and *Mayfield v. United States*, 504 F. Supp. 2d 1023 (D. Or. 2007)).[7] While that requirement certainly applies to searches that are conducted *solely* for law enforcement purposes, the Fourth Amendment is more flexible than

---

[7] Defendants' argument relies in large part on the analysis in *Mayfield*. Because the Ninth Circuit Court of Appeals vacated the judgment in that case, *see Mayfield v. United States*, 599 F.3d 964, 973 (9th Cir. 2010), it is no longer good law and we do not address it.

18

defendants' argument allows. Specifically, the Supreme Court has indicated that the standards governing a "warrant application may vary according to the governmental interest to be enforced and the nature of citizen rights deserving protection." *United States v. U.S. District Court* (*Keith*), 407 U.S. 297, 323 (1972).

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

The Supreme Court has explained that, "[i]n cases in which the Fourth Amendment requires that a warrant to search be obtained, 'probable cause' is the standard by which a particular decision to search is tested against the constitutional mandate of reasonableness." *Camara v. Mun. Ct.*, 387 U.S. 523, 534 (1967). In other words, the critical Fourth Amendment requirement, for purposes of this case, is that the statutory standard for obtaining a warrant must be reasonable. *See United States v. Abu-Jihaad*, 630 F.3d 102, 122 (2d Cir. 2010) ("The benchmark for judicial review of the constitutionality of warrant requirements established by Congress is reasonableness . . . .").

What is reasonable, in turn, depends on the nature of the search: "[t]o apply this standard, it is obviously necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen." *Camara*, 387 U.S. at 534-35. So, for example, in the criminal context, where the objective of a search may be "to recover specific stolen or contraband goods," a warrant to search for such goods "is 'reasonable' only when there is 'probable cause' to believe that they will be uncovered in a particular dwelling." *Camara*, 387 U.S. at 535. But in the administrative context, where searches might be "aimed at securing city-wide compliance with minimum physical standards for private property," *id.* at 535, the reasonableness of the warrant "will not necessarily depend upon specific knowledge" related to a particular property, *id.* at 539; it may be based, instead, on a judicial determination that "the city has adopted a reasonable system of inspections and is not targeting citizens for irregular or malicious reasons," *United States v. Wen*, 477 F.3d 896, 898 (7th Cir. 2006) (describing *Camara*).

The government's interests in security and intelligence are entitled to particular deference. As the Supreme Court has explained, "[w]here . . . the risk against which the Government seeks to guard is substantial, the need to prevent its occurrence furnishes an ample justification for reasonable searches calculated to advance the Government's goal." *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 674-75 (1989). Thus, the Court has indicated that mandatory, suspicionless searches of passengers and luggage at airports may be deemed reasonable "'so long as the search is conducted in good faith for the purpose of preventing hijacking or other like damage and with reasonable scope and

20

the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air.'" *Id.* at 675 n.3 (quoting *United States v. Edwards*, 498 F.2d 496, 500 (2d Cir. 1974)); *see also United States v. Hartwell*, 436 F.3d 174, 179-80 (3d Cir. 2006) (holding airport checkpoint searches constitutional, in part because "there can be no doubt that preventing terrorist attacks on airplanes is of paramount importance" and such searches "advance the public interest" (internal quotation marks omitted)).

The Supreme Court has not addressed the reasonableness of the standards set forth in FISA (or of any searches conducted for the purpose of gathering foreign intelligence), but it has specifically suggested that different probable cause standards for intelligence surveillance "may be compatible with the Fourth Amendment." *Keith*, 407 U.S. at 322. As in the above examples, the key is whether such standards "are reasonable both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens." *Id.* at 322-23. Thus, we must determine whether FISA's "significant purpose" standard is reasonable given the government's special interest in collecting foreign intelligence information. On that key question, we do not write on a blank slate.

### c. The Fourth Amendment and Foreign Intelligence

Probable cause standards *other* than the typical requirement for belief regarding the commission of a crime have been determined to be appropriate and reasonable in the foreign intelligence context. The Supreme Court's decision in *Keith* provides a useful starting point in this area. While

discussing the standards that apply to electronic surveillance for *domestic* security purposes, the Court there observed that certain "policy and practical considerations" differentiate domestic security investigations from ordinary criminal investigations:

- "The gathering of security intelligence is often long range and involves the interrelation of various sources and types of information."

- "The exact targets of such surveillance may be more difficult to identify than in surveillance operations against many types of crimes . . . ."

- "Often, . . . the emphasis of domestic intelligence gathering is on the prevention of unlawful activity or the enhancement of the Government's preparedness for some possible future crisis or emergency."

*Keith*, 407 U.S. at 322. In sum, "the focus of domestic surveillance may be less precise than that directed against more conventional types of crime." *Id.*

In light of these considerations, the Court stated that "Congress may wish to consider protective standards" for domestic security surveillance warrants that "differ from those" prescribed in ordinary criminal cases. *Id.* In particular, it suggested that Congress might "judge that the application and affidavit showing probable cause" for such surveillance "should allege other circumstances more appropriate to domestic security cases." *Id.* at 323. Because the same policy and practical considerations highlighted by the *Keith* Court apply equally, or perhaps even to a greater

extent, to *foreign* intelligence gathering, the Court's comments provide important guideposts for our analysis in this case.

After *Keith*, several courts of appeals, including our own, have examined the Fourth Amendment's application to electronic surveillance conducted under the guise of the President's executive authority to collect foreign intelligence information. These courts almost uniformly have concluded that the important national interest in foreign intelligence gathering justifies electronic surveillance without prior judicial review, creating a sort of "foreign intelligence exception" to the Fourth Amendment's warrant requirement. *See, e.g.*, *United States v. Truong Dinh Hung*, 629 F.2d 908, 914 (4th Cir. 1980) ("[B]ecause of the need of the executive branch for flexibility, its practical experience, and its constitutional competence, the courts should not require the executive to secure a warrant each time it conducts foreign intelligence surveillance."); *United States v. Butenko*, 494 F.3d 593, 605 (3d Cir. 1974) (en banc) (holding, in light of the "strong public interest" in uninterrupted foreign intelligence collection, that the Fourth Amendment does not require "prior judicial authorization" of surveillance "conducted and maintained solely for the purpose of gathering foreign intelligence information"). *See generally Duggan*, 743 F.2d at 72 (summarizing foreign intelligence exception cases).

Admittedly, FISA changed the landscape by instituting a procedure by which the executive branch could seek advance judicial review of, and procure a warrant-like order for, electronic foreign intelligence surveillance. Given the prevailing pre-FISA conclusion that the executive branch could conduct electronic surveillance for foreign intelligence

purposes *without* a warrant, it was perhaps predictable that the courts of appeals that have reviewed FISA, both before and since the Patriot Act amendments, all would conclude that FISA's standards and procedures for authorizing foreign intelligence surveillance orders are reasonable under the Fourth Amendment. *See Abu-Jihaad*, 630 F.3d at 128-29; *Wen*, 477 F.3d at 898-99; *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005); *United States v. Johnson*, 952 F.2d 565, 573 (1st Cir. 1991); *United States v. Pelton*, 835 F.2d 1067, 1075 (4th Cir. 1987); *United States v. Cavanaugh*, 807 F.2d 787, 790-91 (9th Cir. 1987); *Duggan*, 743 F.2d at 72-74; *see also Sealed Case*, 310 F.3d at 746.

### d. The Fourth Amendment and the "Primary Purpose" Requirement for FISA Searches

Defendants do not ignore all of this history. Instead, they focus on the Patriot Act's revision of what is now 50 U.S.C. § 1804(a)(6)(B) to require a national security officer to certify that "a significant purpose," rather than "the purpose" — which courts had interpreted to mean "the primary purpose" — of the surveillance the officer seeks to conduct under FISA is "to obtain foreign intelligence information." They urge that the Patriot Act amendment violates the Fourth Amendment by bringing the standard below this "primary purpose" threshold. In fact, however, the pre-FISA and pre-Patriot Act amendment foreign intelligence cases do not control this case. Those cases do not establish the "primary purpose" requirement as a *sine qua non* of FISA's constitutionality, and, even if they did, we would hold that application of the reasonableness test set forth above counsels a different result.

The notion of a "primary purpose" requirement arises in pre-FISA foreign intelligence surveillance cases. Defendants, understandably, focus on *United States v. Butenko*, 494 F.2d 593, 605-06 (3d Cir. 1974) (en banc), in which our Court held that the executive branch need not secure prior judicial authorization for foreign intelligence surveillance, but commented in *dicta* that, "[s]ince the primary purpose of these searches is to secure foreign intelligence information, a judge, when reviewing a particular search [after the fact] must, above all, be assured that this was in fact its primary purpose and that the accumulation of evidence of criminal activity was incidental." That comment has little bearing here, however, because it arose out facts specific to *Butenko*, not out of a reasoned analysis of what minimum standards would satisfy the Fourth Amendment.[8] *See id.* at 606.

The Fourth Circuit Court of Appeals has come closer to suggesting a link between a "primary purpose" requirement and the constitutionality of foreign intelligence surveillance. In *United States v. Truong Dinh Hung*, 629 F.2d 908 (4th Cir. 1980), it explicitly balanced government and private interests under a series of different standards and concluded that "the executive should be excused from securing a warrant only when the surveillance is conducted 'primarily' for foreign intelligence reasons." *Id.* at 915. But *Truong* also does not control our analysis. It involved "the scope of presidential

---

[8] Specifically, in *Butenko*, the Attorney General certified, and the district court found, that the particular surveillances at issue "'were conducted and maintained *solely* for the purpose of gathering foreign intelligence information.'" 494 F.2d at 601.

25

authority to conduct *warrantless* foreign intelligence surveillance." *Abu-Jihaad*, 630 F.3d at 121. Here, we consider the constitutionality of a program approved by Congress that requires an executive officer to apply to the judicial branch for a warrant-like order. These features distinguish our case from *Truong* in important ways:

> Whatever purpose limits might be placed on the president's authority to conduct warrantless surveillance to ensure that the exception does not extend beyond the constitutional ground for its recognition, it does not follow that the Fourth Amendment demands the same limitation when, as under FISA, the powers of all three branches of government — in short, the whole of federal authority — are invoked in determining when warrants may reasonably be sought and issued for the purpose of obtaining foreign intelligence information.

*Id.*

FISA cases before the Patriot Act amendments often incorporated a "primary purpose" standard without much discussion or analysis, typically by assuming, or even asserting outright, that it was a statutory requirement. *See, e.g.*, *Johnson*, 952 F.2d at 572 (affirming district court determination that FISA surveillance was lawful in part because "it is clear that" the "primary purpose" of the

government's FISA applications "was to obtain foreign intelligence information, not to collect evidence for any criminal prosecution of appellants"); *Pelton*, 835 F.2d at 1075 (rejecting defendant's argument that "FISA surveillance was conducted primarily for the purpose of his criminal prosecution, and not primarily 'for the purpose of obtaining foreign intelligence information' as required by 50 U.S.C. § 1802(b)");[9] *Duggan*, 743 F.2d at 77 ("The requirement that foreign intelligence information be the primary objective of the surveillance is plain not only from the language of § 1802(b) but also from the requirements in § 1804 as to what the application must contain."). Those cases did not expressly link the "primary purpose" standard to an analysis of whether FISA satisfies the Fourth Amendment or consider whether FISA would be constitutional if it incorporated a lower standard instead, which is the question we face now. *Cf. Sealed Case*, 310 F.3d at 727 (concluding that there was "not much need" for courts reviewing pre-Patriot Act amendment FISA cases to focus on the constitutional significance of the "primary purpose" test).

In all events, we do not believe that the Fourth Amendment compels a "primary purpose" test. The dispositive issue is whether the "significant purpose" test is reasonable. Because we conclude that it is for the reasons set

---

[9] 50 U.S.C. § 1802(b) provides, in relevant part: "[A] judge to whom an application is made may, notwithstanding any other law, grant an order . . . approving electronic surveillance of a foreign power or an agent of a foreign power *for the purpose of obtaining foreign intelligence information . . . .*" (emphasis added).

27

forth below, surveillance based on that standard satisfies the Fourth Amendment.

### e. The "Significant Purpose" Test Is Reasonable

We agree with our sister courts of appeals and the Foreign Intelligence Surveillance Court of Review that amended FISA's "significant purpose" standard is reasonable under the Fourth Amendment, for three reasons.

First, the "significant purpose" standard reflects a balance struck by Congress between "the legitimate need of Government for intelligence information" and "the protected rights of our citizens." *Keith*, 407 U.S. at 323. The legislative history reveals that "Congress was keenly aware that [the Patriot Act's amendment to what is now § 1804(a)(6)(B)] relaxed a requirement that the government show that its primary purpose was other than criminal prosecution." *Sealed Case*, 310 F.3d at 732. By adopting the amendment, Congress signaled its determination that the new standard was needed to promote coordination between intelligence and law enforcement officials in combating terrorism, acknowledging that, as a practical matter, these functions inevitably overlap.[10] While Congress's conclusion

---

[10] Senator Dianne Feinstein explained:

> [I]n today's world things are not so simple. In many cases, surveillance will have two key goals—the gathering of foreign intelligence, and the gathering of evidence for a criminal

prosecution. Determining which purpose is the "primary" purpose of the investigation can be difficult, and will only become more so as we coordinate our intelligence and law enforcement efforts in the war against terror.

Rather than forcing law enforcement to decide which purpose is primary . . . this bill strikes a new balance. It will now require that a "significant" purpose of the investigation must be foreign intelligence gathering to proceed with surveillance under FISA.

The effect of this provision will be to make it easier for law enforcement to obtain a FISA search or surveillance warrant for those cases where the subject of the surveillance is both a potential source of valuable intelligence and the potential target of a criminal prosecution. Many of the individuals involved in supporting the September 11 attacks may well fall into both of those categories.

in that regard of course is not dispositive, nonetheless, the Supreme Court in *Keith* suggested that "congressional judgment" has an important role to play in weighing government interests and determining reasonable "protective standards" related to intelligence. *Keith*, 407 U.S. at 322-23. We therefore view Congress's actions in this area with some additional measure of deference.

Second, even leaving Congress's judgment aside, we conclude that FISA's "significant purpose" standard is reasonable in light of the government's legitimate national security goals. We are mindful of the high stakes involved and emphasize the Supreme Court's admonition that "[w]here, as here, the possible harm against which the Government seeks to guard is substantial, the need to prevent its occurrence furnishes an ample justification for reasonable searches calculated to advance the Government's goal." *Von Raab*, 489 U.S. 674-75; *see also id.* at 675 n.3 (approving Second Circuit Court of Appeals' conclusion that "'[w]hen the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in pirating or blowing up of a large airplane, that danger *alone* meets the test of reasonableness so long as the search is conducted in good faith for the purpose of preventing hijacking'" and other safeguards are in place (quoting *Edwards*, 498 F.2d at 500)).

Replacing the "primary purpose" standard with a "significant purpose" test reasonably furthers the government's national security goals. As other courts, and Congress, have observed, the *status quo ante* proved difficult to administer — in complex national security investigations,

147 Cong. Rec. S10,591 (Oct. 11, 2001), *quoted in Sealed Case*, 310 F.3d at 732-33.

30

it was often difficult to say whether intelligence or law enforcement, or neither of them, was the "primary" objective — and resulted in a rigid, artificial separation between intelligence and law enforcement investigations that prevented cooperation and, ultimately, "imposed a cost on national security." *Abu-Jihaad*, 630 F.3d at 124-25; *see also Sealed Case*, 310 F.3d at 732-33, 743-44 & nn.27-29.

The "significant purpose" standard, which reflects a "negotiated compromise" between those in Congress who wished to keep the law the same and officials in the executive branch, "who wished to virtually eliminate the foreign intelligence standard," 147 Cong. Rec. S10,591 (Oct. 11, 2001) (statement of Sen. Dianne Feinstein); *see also Abu-Jihaad*, 630 F.3d at 125-26; *Sealed Case*, 310 F.3d at 732, alleviates those practical concerns by doing away with the problematic "primary purpose" test. It also retains key protections for individuals. In particular, the Foreign Intelligence Surveillance Court of Review has held that the statute, as amended, "require[s] 'that the government have a measurable foreign intelligence purpose, other than just criminal prosecution of even foreign intelligence crimes'" and "'excludes from the purpose of gaining foreign intelligence information a sole objective of criminal prosecution,' even for foreign intelligence crimes." *Abu-Jihaad*, 630 F.3d at 128 (quoting *Sealed Case*, 310 F.3d at 735); *see also Sealed Case*, 310 F.3d at 736 ("[T]he FISA process cannot be used as a device to investigate wholly [non-foreign-intelligence related] ordinary crimes.").

Finally, and importantly, FISA contains significant procedural safeguards against abuse. As amended, FISA requires a senior government official (typically the Director of the FBI, *see Sealed Case*, 310 F.3d at 736) to certify that

31

"obtaining foreign intelligence information . . . is a *bona fide* purpose of the surveillance" and the Attorney General (or a senior-level designee, *see* 50 U.S.C. § 1801(g)) to approve each FISA application. *Abu-Jihaad*, 630 F.3d at 127. That senior Justice Department officials must approve every FISA application gives us additional comfort that this process does not provide an end run around the more stringent Fourth Amendment standards that apply in ordinary criminal cases.

The statute also provides for appropriate, albeit limited, judicial review. An Article III judge sitting on the FISA court reviews every application, makes particularized findings concerning the application's compliance with the statute's requirements, and issues an order specifying the parameters of the government's surveillance authority. *See* 50 U.S.C. § 1805(a), (c). The FISA judge may demand "further inquiry into the certifying officer's purpose — or perhaps even the Attorney General's or Deputy Attorney General's reasons for approval" of the application, and should deny the application if he or she "conclude[s] that the government's sole objective [is] merely to gain evidence of past criminal conduct — even foreign intelligence crimes — to punish the agent rather than halt ongoing espionage or terrorist activity." *Sealed Case*, 310 F.3d at 735-36. These safeguards confirm that FISA's "significant purpose" standard is reasonable under the Fourth Amendment.

## f. Evidence Derived from a Reasonable Search Is Admissible in a Criminal Trial

Underlying defendants' argument that FISA's "significant purpose" test is unconstitutional is the notion that the government should not be allowed to introduce in a

criminal prosecution evidence not gathered in compliance with the minimum procedural requirements the Fourth Amendment typically imposes on criminal investigations. While that notion may be appealing, it does not reflect the law. Instead, it is clear that the government may use evidence derived from non-law-enforcement searches (i.e., searches not based on a reasonable belief regarding the commission of a crime) that otherwise satisfy the Fourth Amendment's reasonableness requirement to prosecute crimes. Thus, in the administrative context, "[i]nspectors lawfully on the premises . . . may report any violations of law that they find." *Wen*, 477 F.3d at 898. Likewise, the government may prosecute a defendant for possession of drugs uncovered in the course of a routine airport search. *See Hartwell*, 436 F.3d at 181; *see also id.* at 181 n.13 ("[T]he fruits of the search need not be suppressed so long as the search itself was permissible.").

Here, we have concluded that searches in the form of surveillance conducted pursuant to FISA's "significant purpose" requirement are reasonable under the Fourth Amendment. Accordingly, we join other courts of appeals in holding that evidence derived from duly authorized FISA surveillance is admissible in a criminal case. *See Wen*, 477 F.3d at 898 (holding that if, in the course of conducting FISA-authorized surveillance, "agents discover evidence of a domestic crime, they may use it to prosecute for that offense," even if the agents knew or "may have known" when they applied for the FISA order "that they were likely to hear evidence of domestic crime"); *see also Duggan*, 743 F.2d at 78 (noting that "otherwise valid FISA surveillance is not tainted simply because the government can anticipate that the fruits of such surveillance may later be used, as allowed by

33

[50 U.S.C.] § 1806(b), as evidence in a criminal trial" and holding that "the fact that domestic law enforcement concerns may also have been implicated" in government's decision to seek a FISA order "did not eliminate the government's ability to obtain a valid FISA order").

## 2. Defendants Are Not Entitled to Relief Because the FISA Searches Were Conducted in Reasonable Reliance on a Statute

We are confident that FISA's "significant purpose" test satisfies the Fourth Amendment. But even if we were not, we still would not overturn defendants' convictions based on the government's use of FISA-derived evidence at trial. Supreme Court precedent makes abundantly clear that, even if we were to conclude that amended FISA is unconstitutional, evidence derived from it would nevertheless have been admissible in the government's case.

Defendants' argument for reversal depends in part on the theory that, if FISA violates the Fourth Amendment, FISA-derived evidence automatically must have been excluded.[11] *See, e.g.*, Appellants' Joint Opening Br. 53 ("By

---

[11] Defendants' theory also depends on the notion that, absent the FISA-derived evidence, the government would not have been able to secure their convictions. *See, e.g.*, Appellants' Joint Opening Br. 53 (asserting that, if FISA-derived evidence were excluded, "no evidence would be admissible to prove the elements of the crimes charged and Appellants could not be convicted of the charges"). We do not reach this aspect of defendants' argument, but, in light of the *de minimis*

34

holding FISA as amended by the Patriot Act unconstitutional the evidence used will be illegally obtained and prohibited to be used in trial against the Appellants."). But that is not necessarily so. *See United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010) ("[A] determination that the Fourth Amendment has been violated does not necessarily require application of the exclusionary rule."). The exclusionary rule precludes the admission of evidence tainted by a Fourth Amendment violation "only in those unusual cases in which exclusion will further the purposes of the . . . rule." *United States v. Leon*, 468 U.S. 897, 918 (1984). Because the rule "is designed to deter police misconduct," *id.* at 916, it applies only where it will "alter the behavior of individual law enforcement officers or the policies of their departments," *id.* at 918.

The Supreme Court has ruled categorically that "suppress[ing] evidence obtained by an officer acting in objectively reasonable reliance on a statute" would not further the purposes of the exclusionary rule, even if that statute is later declared unconstitutional. *Illinois v. Krull*, 480 U.S. 340, 349-50 (1987). Therefore, even a defendant who can establish that evidence against him or her was procured under a statute that violates the Fourth Amendment is not entitled to have such evidence excluded from his or her criminal trial unless he or she can establish that the officer's reliance on the statute was not objectively reasonable. *Cf. Krull*, 480 U.S. at 368 (O'Connor, J., dissenting) (observing that, "under [the Court's] decision today, no effective remedy is to be provided

nature and quantity of the FISA-derived evidence, *see supra* n.4, we doubt seriously that would be the case.

in the very case in which the statute at issue was held unconstitutional").

The FISA amendment defendants challenge was duly enacted by Congress through the Patriot Act, and defendants have not argued on appeal that government officials did not reasonably rely on amended FISA in seeking the surveillance orders at issue in this case.[12]  Thus, under *Krull*, the exclusionary rule plainly does not apply, and, even if we agreed with defendants that the "significant purpose" test is unconstitutional, we would be powerless to overturn their convictions on that ground.

### B. Statements Made "In Furtherance" of the Conspiracy

Serdar Tatar argues that the District Court improperly admitted under the coconspirator exception to the hearsay rule two sets of statements made by Dritan and Shain Duka about him.  Federal Rule of Evidence 801(d)(2)(E) provides, in relevant part, that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay.  Fed. R. Evid. 801(d)(2)(E).  Tatar argues that

---

[12] The objective reasonableness of the officers' reliance on the statute in this case is further bolstered by the fact that the particular provision at issue has been reviewed and declared constitutional by several courts, going as far back as 2002. *See Sealed Case*, 310 F.3d at 746; *see also Abu-Jihaad*, 630 F.3d at 128-29; *Wen*, 477 F.3d at 898-99; *Damrah*, 412 F.3d at 625; *cf. Davis v. United States*, 131 S. Ct. 2419, 2434 (2011) (holding that "when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply").

the District Court erred in finding that the relevant statements were made "in furtherance" of the conspiracy.  We hold that the District Court did not abuse its discretion by admitting the first set of statements.  Although it abused its discretion in admitting the second set of challenged statements, its error was harmless in light of the other evidence of Tatar's participation in the conspiracy to kill United States military personnel, the only offense of which he was convicted.

### 1. The Challenged Statements and the District Court's Rulings

The first set of statements comes from an audio recording of a conversation among Dritan Duka, Shain Duka, and confidential informant Besnik Bakalli.  Dritan said that Tatar "wanted to join the military in America" and "wanted to kill them from inside."  (Joint App. 2789.)  He told Bakalli that Tatar "was very serious, just to get in and kill them" and that he was "a maniac, he sees [UI] like we aren't human by watching Muslims get killed everyday [UI]."[13]  (*Id.*)  Later, he said that, when Tatar sought to join the U.S. military, "[t]hat was the only thing on his mind that he kill American soldiers" (Joint App. 2791).  Shain Duka said, "[Tatar]'s not totally all there, like you're supposed to be" and that Tatar was "very funny but he's not serious."  (Joint App. 2789.)

The District Court accepted the government's argument that these statements were made in furtherance of the conspiracy because the Dukas wanted to show Bakalli that they were serious, to keep Bakalli in the conspiracy, and "to buck him up."  (Joint App. 950.)  After discussing other evidence in the record (including Tatar's own admissions)

---

[13]  [UI] denotes unintelligible words in the recordings.

concerning Tatar's attempts to join the military, the District Court concluded that these statements were akin to a "present sense assurance to Mr. Bakalli that this is a serious matter. We've got these people lined up who are going to do serious things and I mean and look at Serdar, he's so serious about this, he wanted to join the military to get on the inside." (Joint App. 951.)

The second set of statements occurred later in the same conversation, when Shain Duka was discussing "our group." Shain said, "our group was this Sayed, that boy, the Turk, Serdani [i.e., Tatar], me, Dritoni [i.e., Dritan], Sulemaini [i.e., Eljvir] . . ." and that, "[b]etween the six of us that hung out together, there was no motherf***** that could f*** with us. Everybody feared us, We were bad. Heading on the wrong path." (Joint App. 2795-96.) The District Court originally expressed some reluctance to admit these statements, saying, "I don't know what the context of that conversation . . . is to be honest," but ultimately concluded that the statements were admissible because they were "talking about an association that apparently the Government contends continued through the length of the conspiracy. It shows that they've been together as a group for some time." (Joint App. 949.)

## 2. Rule 801(d)(2)(E) Analysis

"'We review a District Court's decision to admit or exclude evidence for abuse of discretion, although our review is plenary as to the district court's interpretation of the Federal Rules of Evidence.'" *United States v. Riley*, 621 F.3d 312, 337 (3d Cir. 2010) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 297 (3d Cir. 2007)).

As a threshold matter, we reject Tatar's argument, made in passing, that the statements do not qualify under the Rule because they were made to a government informant, "not . . . an alleged coconspirator," Appellants' Joint Opening Br. 92, because no blanket rule forbids the admission of coconspirator statements made to informants. Where coconspirators' statements have been made to government informants and were intended to keep others "abreast of developments and allay any fear they might have had," we have held that they satisfy the "in furtherance of the conspiracy" requirement. *United States v. Gibbs*, 739 F.2d 838, 840 n.2 (3d Cir. 1984); *cf. Bourjaily v. United States*, 483 U.S. 171, 173-74, 184 (1987) (affirming court of appeals' determination that telephone conversations between defendant's coconspirator and FBI informant were made in furtherance of the conspiracy and admissible under Rule 801(d)(2)(E)). As far as Dritan and Shain Duka were concerned, Bakalli *was* involved in the conspiracy. Therefore, as long as the statements satisfy the other requirements of Rule 801(d)(2)(E), i.e., they were made "during the course and in furtherance of the conspiracy," they are admissible.

Tatar's challenge focuses on whether the statements satisfy the "in furtherance" requirement. We have previously explained that "'[s]tatements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy'" satisfy that requirement "'and are admissible so long as the other requirements of Rule 801(d)(2)(E) are met.'" *United States v. Weaver*, 507 F.3d 178, 182 (3d Cir. 2007) (quoting *United States v. Ammar*, 714 F.2d 238, 252 (3d Cir. 1983)). The threshold for establishing that a

39

statement was made in furtherance of a conspiracy is not high: "'[t]he in furtherance requirement is usually given a broad interpretation.'" *Id.* at 183 (quoting *Gibbs*, 739 F.2d at 845).

Applying these standards, we cannot say the District Court abused its discretion in concluding that the first set of challenged statements was made "in furtherance" of defendants' conspiracy. The District Court found that, in the context of the overall conversation, the first set of statements was intended to reassure Bakalli and maintain trust within the conspiracy by illustrating for Bakalli the seriousness of the conspirators' intent. Its analysis in that regard is reasonable, and Tatar has not pointed to any specific dialogue or evidence that would undermine the District Court's conclusion.

The second set of statements is more problematic. The District Court reasoned that the statements were evidence of the Dukas' association with Tatar, but did not make any finding regarding how those statements *furthered* the conspiracy. The government offers a couple of arguments as to how these statements could be viewed as "in furtherance of" the conspiracy — "Shain's statements about the long duration and comradely nature of his and his brother's association with Tatar, dating to when they were high school students together, were designed to show Bakalli that . . . Dritan and Shain had a well-grounded and reliable understanding of Tatar's proclivities, and thus could be counted on to accurately predict how far Tatar would be willing to go to advance the lethal goals of the conspiracy," and "Even if Dritan and Shain were not then actively recruiting Bekalli [*sic*] into the conspiracy, the statements furthered the conspiracy by tacitly warning Bekalli [*sic*] not to expose it." Consol. Br. for Appellee 124-25. We do not

find either of those explanations convincing, especially because, as the District Court observed, the transcript provides no broader context for that portion of the conversation. (Joint App. 949.) Moreover, in our view, the relevance of the second set of statements was tenuous at best, and, in all events was clearly outweighed by the potential for prejudice inherent in the suggestion of Tatar's close association with the other defendants. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."). We therefore conclude that the District Court abused its discretion in admitting them.

Given our deferential standard of review, however, we must conclude that the District Court's abuse of discretion was harmless in the context of this trial. As we discuss below, the admission of the second set of statements does not undermine confidence in the verdict against Tatar. *See United States v. Zerhbach*, 47 F.3d 1252, 1264 (3d Cir. 1995) (en banc) ("An appellate court should not exercise its 'supervisory power to reverse a conviction . . . when the error to which it is addressed is harmless, since, by definition, the conviction would have been obtained notwithstanding the asserted error.'" (quoting *United States v. Hasting*, 461 U.S. 499, 508-09 (1983))). We also observe that Tatar has not argued on appeal that those statements were inadmissible under Rule 403.

### 3. Harmless Error

"An error in an evidentiary ruling is harmless . . . when 'it is highly probable that the error did not affect the result.'" *United States v. Friedman*, --- F.3d ----, 2011 WL 4470674, at *7 (3d Cir. Sept. 28, 2011) (quoting *Hill v. Laeisz*, 435 F.3d

41

404, 420 (3d Cir. 2006)). "High probability means that we have a sure conviction that the error did not prejudice the defendants." *United States v. Casseus*, 282 F.3d 253, 256 (3d Cir. 2002) (internal quotation marks omitted). That is the case here, where evidence other than the challenged statements amply supports Tatar's sole conviction for conspiracy to murder United States military personnel. More specifically, the government established, through evidence Tatar does not challenge on appeal, that Tatar participated in the conspiracy with the other defendants, i.e., that he "knew of the agreement and intended both to join it and to accomplish its illegal objects." *United States v. McKee*, 506 F.3d 225, 241 (3d Cir. 2007).

**Tatar knew of the agreement.** Tatar appeared in the video that the FBI discovered of defendants at the shooting range in the Poconos. He discussed violent jihad with the other defendants and gathered with them to listen to and discuss Anwar al-Awlaki's *Constants on the Path of Jihad*, a lecture advocating violent jihad. (*See* Joint App. 979, 989, 2749-52, 2784-85.) In a recorded conversation with government informant Omar, Tatar agreed to provide Omar with a map of Fort Dix after Omar explained that he needed the map as part of his plan to make "this country . . . pay the price for something they did to me." (Joint App. 2098-99.) Tatar understood and acknowledged the gravity of what Omar proposed: in a subsequent conversation, Tatar specifically asked Omar, "[W]hat are you thinking of doing?" (Joint App. 2123.) After Omar responded by describing his surveillance of Fort Dix with Shnewer, Tatar said, "This is nothing small." (Joint App. 2124.) In addition to this evidence, the government also introduced the transcript of a recorded conversation between Shnewer and Omar, the admission of

42

which Tatar has not challenged on appeal, in which Omar told Shnewer that Tatar was aware that Omar and Shnewer had made "a plan on the basis that, in the future, we'll make an attack on Fort Dix." (Supp. App. 88-89.)

**Tatar intended both to join the conspiracy and to accomplish its illegal objects.** Tatar plainly understood the implications of providing Omar and Shnewer with the map of Fort Dix. At one point, he said to Omar, "I'm getting involved in it, you understand? I'm getting involved in it by giving you the maps." (Joint App. 2123.) In a conversation discussing the planned attack on Fort Dix, Tatar also told Omar, "I'm in, honestly, I'm in." (Joint App. 2114.) Finally, Tatar expressed his decision to join the group in unequivocal terms, saying:

> I'm gonna do it. . . . I'm gonna give it to you. . . . It doesn't matter to me, whether I get locked up, arrested, or they take me away, it doesn't matter. Whether I die, don't matter, I'm doing it in the name of Allah.

(Joint App. 2135.) Omar testified at trial that, after all of this discussion, Tatar actually gave him the Fort Dix map, confirming that he intended to help Omar and Shnewer carry out their attack. (Joint App. 477-78.)

Given this direct evidence of Tatar's participation in the conspiracy, we do not view the admission of the challenged statements concerning Tatar's attempts to join the military to attack it from the inside, or his long association with the Duka brothers, as significant. We note, further, that

43

the admitted statements were mostly cumulative of other evidence: the video from the Poconos and numerous recorded conversations established that Tatar socialized with the other defendants, and Dritan Duka's challenged statement was not the only evidence that Tatar had tried to attack U.S. institutions from "the inside" — in a recorded conversation, Tatar suggested to Omar that "you could do it from the inside" and said that he had attempted to become a police officer in California for precisely that reason. (Joint App. 2139.) Therefore, we will not reverse Tatar's conviction based on the District Court's admission of the challenged coconspirator statements.

## C. Other Issues

In addition to the challenges discussed in detail above, defendants raised numerous other challenges to their convictions and sentences in their consolidated, counseled brief and in individual briefs we permitted them to file *pro se*. Those challenges relate to:

- the District Court's admission of jihadist videos, certain audio recordings, coconspirator statements made by Shnewer, and evidence seized from Tatar's apartment;

- whether the prosecution constructively amended the indictment or violated defendants' Fifth Amendment rights during its closing argument;

- whether the District Court erred in failing *sua sponte* to strike a juror whose son was wounded in combat in Iraq but who stated during *voir*

44

*dire* that her son's experience would not affect her judgment;

- whether the prosecution improperly took inconsistent positions concerning the relationship between the Duka brothers and government informant Omar;

- the sufficiency of the evidence supporting the conspiracy charges against Eljvir Duka and Serdar Tatar;

- the District Court's application of enhancements for terrorism and for targeting "official victims" to defendants' sentences and its failure to consider the role of the government informants when determining defendants' sentences;

- the District Court's denial of defendants' fifth request for a continuance of trial;

- the restitution portion of Shnewer's sentence;

- jury instructions;

- ineffective assistance of counsel; and

- whether, even assuming each of defendants' challenges fails individually, all of the legal, factual, and procedural errors they have raised cumulatively deprived defendants of their right to a fair trial.

None of the evidentiary issues rises to the level of reversible error. The most significant challenge is made to the District Court's decision to admit videos of beheadings that defendants viewed and discussed at length as part of their overall preparations for jihad. Defendants argue that the District Court abused its discretion in admitting the videos under Federal Rule of Evidence 403 because they were unduly prejudicial and lacked any probative value relative to the charges.[14] We disagree. The District Court carefully considered the parties' arguments; determined that the video evidence "explains or could explain if the jury accepts it, I should say, why the defendants would do what they're charged with doing" (Supp. App. 807); and required the government to "sanitize" the videos, replacing the actual beheadings with a "rather antiseptic description of what happens" to be delivered by a government witness at trial (Supp. App. 809). Based on the foregoing, the District Court could not "conclude that the probative value" of the redacted videos "is substantially outweighed by the danger of unfair . . . prejudice in this case." (*Id.*)

After reviewing the videos and the testimony that accompanied them at trial, we conclude that the District Court reasonably assessed the videos' relevance and probative value and took appropriate steps to mitigate their prejudicial

---

[14] Federal Rule of Evidence 403 provides, in relevant part: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."

46

impact.[15]   We discern no error in the District Court's approach.  *Cf. Abu-Jihaad*, 630 F.3d at 133-34 (identifying "no error, let alone arbitrary or irrational error," in the district court's decision to admit violent, pro-jihadist videos to show defendant's "motive and intent" in participating in a scheme to communicate information to be used in the destruction of a U.S. military ship where danger of prejudice was minimized by redactions and limiting instructions).

The District Court approached each of the evidentiary issues before us on appeal with the same thoroughness and thoughtfulness it employed in analyzing the beheading videos.  We find no abuse of discretion with respect to any of those issues and commend Judge Kugler for his handling of this lengthy and complicated trial.

We also reject defendants' argument that the prosecution constructively amended the indictment during the rebuttal portion of its closing remarks.  Specifically, defendants urge that the prosecutor's assertion that "[i]t doesn't matter if the object of the conspiracy was to kill a soldier in Delaware, or in Pennsylvania, or in Iraq or Afghanistan" impermissibly broadened the superseding indictment which, they contend, charged only a conspiracy to

---

[15]   The District Court spoke only in terms of the videos' "relevance" under Federal Rule of Evidence 401, and did not separately analyze their "probative value" under Federal Rule of Evidence 403.  But we do not view that as an error, let alone a reversible error, here, where the videos' probative value — providing the jury with insights into defendants' state of mind by allowing it to view videos that defendants viewed to prepare for their planned attack — was closely tied to their relevance.

47

attack military personnel at specified bases in New Jersey, Delaware, or Pennsylvania. Defendants did not raise this issue in the District Court, so our review is only for plain error. *United States v. Vosburgh*, 602 F.3d 512, 531 (3d Cir. 2010).

"'An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged.'" *Id.* at 532 (quoting *United States v. Daraio*, 445 F.3d 253, 259-60 (3d Cir. 2006)). That is not what happened here, because the challenged remarks did not refer to an element or "essential term" of the charged offense. The statutes under which defendants' conspiracy charge arose, 18 U.S.C. §§ 1117 and 1114, do not even refer to the place where the defendant intends to kill the federal employee, i.e., whether at a particular base in New Jersey or somewhere in Afghanistan, let alone define it as an element of the conspiracy or the underlying substantive offense.[16]

---

[16] 18 U.S.C. § 1117, "conspiracy to murder," provides:

> If two or more persons conspire to violate section 1111, 1114, 1116, or 1119 of this title, and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life.

48

At most, then, the prosecutor's comments reflected a "variance" from the indictment. *See United States v. McKee*, 506 F.3d 225, 231 n.7 (3d Cir. 2007) (distinguishing constructive amendments from variances); *see also Vosburgh*, 602 F.3d at 532 n.20 (same). Unlike a constructive amendment, a variance is a reversible error only where the defendant establishes "'that the variance prejudiced some substantial right.'" *Id.* at 532 (quoting *Daraio*, 445 F.3d at 262). "A variance that sufficiently informs the defendant of the charges against him and allows him to prepare his defense without being misled or surprised at trial does not prejudice the defendant's substantial rights." *Id.* Here, defendants have not argued that the prosecutor's comment surprised them or

---

18 U.S.C. § 1114, "protection of officers and employees of the United States," sets forth the punishment for:

> Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance.

otherwise prevented them from presenting their case at trial in any way. Accordingly, their argument that the prosecutor's comment constitutes reversible error must fail.[17]

Having thoroughly reviewed each of the other issues presented in defendants' myriad briefs, we conclude that they lack merit.[18]

### D. The Attempted Possession Counts

One week before oral argument in this case, the government informed us in a letter that it had discovered a legal error in the superseding indictment that was tried to the jury: Count 3, against Dritan and Shain Duka,[19] and Count 4,

---

[17] Although we analyze this issue as a variance, not a constructive amendment, we note that defendants' constructive amendment challenge would likely also fail on its own terms because ample evidence supported defendants' convictions of conspiracy to attack military bases in New Jersey, Pennsylvania, and Delaware, particularly the United States Army Base at Fort Dix. *See Vosburgh*, 602 F.3d at 532 ("If a defendant is convicted of the same offense that was charged in the indictment, there is no constructive amendment.").

[18] In particular, we note that we ordinarily do not address ineffective-assistance arguments on direct appeal, especially where, as here, the factual basis for the claims is not well developed. *See United States v. Thornton*, 327 F.3d 268, 271-72 (3d Cir. 2003).

[19] Eljvir Duka also was charged in Count 3, but was acquitted of that count.

against Mohamed Shnewer, each charged a non-existent crime, namely, attempted possession of firearms in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A).[20]  The government explained that, because § 924(c) does not contain an explicit attempt provision and there is no general federal attempt statute, "attempted possession of firearms in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)" is not a legally cognizable crime.

The government also has informed us that it will not defend Shnewer's Count 4 conviction, as the indictment and verdict slip framed Count 4 solely as an attempt offense. Accordingly, we will vacate Shnewer's conviction and sentence for Count 4 and remand so that the District Court can dismiss Count 4 and remove (or refund) the associated $100 special assessment.

At the same time, the government urges us to affirm the convictions of Dritan and Shain Duka on Count 3. That count differs from Count 4 because the indictment charged possession *or* attempted possession of seven specific firearms in furtherance of a crime of violence under § 924(c)(1)(A),

---

[20]   18 U.S.C. § 924(c)(1)(A) provides, in relevant part: "[A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall" be subject to a mandatory minimum sentence of imprisonment set forth in the statute "in addition to the punishment provided for such crime of violence or drug trafficking crime . . . ."

and therefore contained both valid and invalid theories of liability. The government argues that any charging error on that count was not plain and, in all events, was harmless under *Hedgpeth v. Pulido*, 555 U.S. 57 (2008) (per curiam), because its theory against Dritan and Shain on Count 3 at trial was that they *actually* possessed the seven specified firearms and the evidence established beyond any doubt that Dritan and Shain actually possessed those guns.[21] Dritan and Shain argue that we must vacate their convictions on Count 4 because the jury *may have* relied on the invalid attempt theory.

---

[21] The government initially argued that defendants waived their rights to challenge their convictions on Counts 3 and 4 by failing to identify this issue in their opening briefs, but it appears to have abandoned this argument in its subsequent letter brief. In all events, we consider the possibility that defendants may have been convicted of a crime that does not exist to be an "extraordinary circumstance" that warrants review. *Cf. United States v. Albertson*, 645 F.3d 191, 195-96 (3d Cir. 2011) (reviewing merits of challenge that may otherwise have been waived where (1) government would not be prejudiced because it had an opportunity to present briefing on the challenge and "failed to pursue meaningfully its waiver argument" in that briefing and (2) failure to consider challenge may have affected the fairness of the judicial proceedings); *see also United States v. Tann*, 577 F.3d 533, 542-43 (3d Cir. 2009) (holding that, under *Ball v. United States*, 470 U.S. 856 (1985), and *Rutledge v. United States*, 517 U.S. 292 (1996), improper conviction affected defendant's substantial rights).

We first consider what standard applies to our review of this issue. The Supreme Court made clear in *Pulido* that questions involving juries that are "instructed on multiple theories of liability, one of which is improper," are "trial errors subject to harmless-error review."[22] 555 U.S. at 60-61. Dritan and Shain argue that their convictions on Count 4 were not harmless because it is not clear beyond a reasonable doubt that the jury would have convicted them absent the attempt theory. *See United States v. Saybolt*, 577 F.3d 195, 206 (3d Cir. 2009) ("An error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)) (internal quotation marks omitted)).

The government argues that, because Dritan and Shain failed to raise this issue in the District Court, the more stringent plain-error standard applies. We agree. Defense counsel certainly should have brought to the District Court's attention the fact that the indictment charged their clients with a non-existent crime. Moreover, as a legal matter, *Pulido* holds that alternative-theory errors are "trial errors," not "structural errors." 555 U.S. at 60-61. Accordingly, they are not subject to the "structural error" exception to the plain-error rule. *See United States v. Marcus*, 130 S. Ct. 2159, 2164-65 (2010). Where, as here, an issue was not raised in the district court, we are not aware of any other basis for

---

[22] *Pulido* was a habeas case, but the Court later confirmed that harmless-error analysis is to be conducted in direct-appeal cases (like this one) as well as those on collateral review. *See United States v. Skilling*, 130 S. Ct. 2896, 2934 n.46 (2010).

avoiding Federal Rule of Criminal Procedure 52(b)'s plain-error rule.

Review for plain error proceeds in four steps, with the burden placed on defendants. We must determine whether Dritan and Shain have demonstrated that:

> (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Id.* at 2164 (internal quotation marks and alterations omitted).

The government has conceded an error that is clear — the first two prongs of the analysis — by admitting that the indictment charged Dritan and Shain with an "attempt" crime that does not exist. This point appears to be well taken, as several statements from other courts support the proposition that an attempt to violate § 924(c)(1)(A) is not a legally cognizable offense. *See, e.g.*, *United States v. Douglas*, 525 F.3d 225, 251 (2d Cir. 2008) (because there is no general federal attempt statute, "an attempt to commit criminal conduct 'is . . . *actionable only where . . . a specific criminal statute makes impermissible its attempted as well as actual violation*'" (second omission and emphasis in original)); *United States v. Anderson*, 89 F.3d 1309, 1314 (6th Cir. 1996)

("§ 924(c), among other things, makes it a crime to use or carry a firearm during a drug trafficking offense; it does not specifically criminalize an *attempt* to use or carry a firearm during such an offense." (citations omitted)). *See generally United States v. Berrigan*, 482 F.2d 171, 185 (3d Cir. 1973) ("Federal criminal law is purely statutory; there is no federal common law of crimes.").

Thus, we turn to the third prong, whether the error affected Dritan and Shain's "substantial rights," i.e., whether it "affected the outcome of the district court's proceedings." *Marcus*, 130 S. Ct. at 2164 (internal quotation marks and citations omitted). We agree with the government that it did not because the evidence at trial clearly established Dritan and Shain Duka's *actual*, as opposed to attempted, possession of the firearms at issue in Count 3.

In contrast with the allegations in Count 4 that Shnewer only "attempt[ed] to possess" an unspecified "AK-47 machinegun and/or semiautomatic assault weapon,", Count 3 of the superseding indictment charged Dritan and Shain Duka with "possess[ing] or attempt[ing] to possess" seven particular firearms, each identified by make, model, and serial number. The government entered each of the specified firearms into evidence, along with testimony from a law enforcement officer that he placed those weapons in the apartment of confidential informant Mahmoud Omar on the evening of May 7, 2007. (Joint App. 233-34.) Omar's eyewitness testimony, and audio and video recordings from FBI surveillance equipment installed in Omar's apartment, established that, on May 7, 2007, Dritan and Shain Duka came to Omar's apartment, handed over $1,400 in cash to Omar, and took possession of the seven weapons. Federal and state law enforcement agents arrested Dritan and Shain

55

inside Omar's apartment that evening as they prepared to take the guns out to their car. (Joint App. 238.) The government's sole argument to the jury on Count 3 against Dritan and Shain was that the "May 7th recording" provided "overwhelming evidence" that they actually possessed the relevant firearms.[23] (Joint App. 1282.)

We acknowledge that the jury instructions did not clearly distinguish between the attempt and actual possession theories of liability (*see* Joint App. 1250-51) and the verdict slip allowed the jury to convict Dritan and Shain on Count 3 if it found beyond a reasonable doubt that they "possessed or attempted to possess" firearms in furtherance of the conspiracy and attempt offenses charged in Counts 1 and 2 of the indictment. But we conclude in light of the evidence and the way the government argued the case to the jury that there is no reasonable possibility that the jury convicted Dritan and Shain of the unlawful attempt, as opposed to the proper actual possession, offense.

---

[23] In this regard, the government's argument against Dritan and Shain on Count 3 contrasts sharply with its argument against Eljvir Duka on Count 3, which relied on a coconspirator theory (*see* Joint App. 1282-83 ("Eljvir Duka clearly was not at the May 7th deal. But by then it's certainly foreseeable to him that his coconspirators, Dritan and Shain Duka would be getting guns.")), and its argument against Shnewer on Count 4, which was based on a pure attempt theory (*see* Joint App. 1283 (citing evidence "where Mohamed Shnewer makes numerous efforts to acquire the guns from Omar and says he's got the money ready" as proving Count 4 "beyond a reasonable doubt")).

Dritan's and Shain's arguments to the contrary are unpersuasive. They rely on other evidence concerning their attempts to acquire weapons before the May 2007 transaction and the prosecution's comments on that evidence during its summation. But that evidence does not speak to the seven specific weapons identified in Count 3 of the indictment, and the prosecution only used it to bolster its argument that defendants were serious about attacking the military. The evidence concerning the Dukas' previous attempts to obtain firearms does not negate the extensive, direct evidence of the May 7th transaction or the fact that the prosecution clearly focused on Dritan's and Shain's actual possession of weapons on May 7th as its sole theory of liability against them on Count 3.

## III.

For the foregoing reasons, we will reverse Shnewer's conviction on Count 4. We will vacate the 360-month consecutive sentence imposed for that count and remand for the limited purpose of dismissing that count and removing the associated $100 special assessment. As to all of the other counts, we will affirm the judgments of the District Court.