**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-1079 & 18-1097
_____

UNITED STATES OF AMERICA

v.

MARQUIS WILSON,
                    Appellant in No. 18-1079
_____

UNITED STATES OF AMERICA

v.

MALCOLM MOORE,
                    Appellant in No. 18-1097
_____

On Appeals from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Nos. 2:14-cr-00209-001 & 2:14-cr-00209-002)
District Judge: Honorable Mark A. Kearney
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on April 28, 2020

Before: HARDIMAN, GREENAWAY, JR., and BIBAS,
*Circuit Judges*

(Filed: May 22, 2020)
_____


Alison Brill
Office of the Federal Public Defender
22 South Clinton Avenue
Station Plaza #4, Fourth Floor
Trenton, NJ 08609

   *Counsel for Appellant Marquis Wilson*


Linda D. Hoffa
Dilworth Paxson
1500 Market Street, Suite 3500E
Philadelphia, PA 19102

   *Counsel for Appellant Malcolm Moore*


William M. McSwain
Robert A. Zauzmer
Salvatore L. Astolfi
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

   *Counsel for Appellee*

———————————

OPINION OF THE COURT

———————————

BIBAS, *Circuit Judge*.

A jury convicted Marquis Wilson and Malcolm Moore of two counts of armed bank robbery, conspiracy to rob banks, and two counts of using a firearm in the course of committing a crime of violence. They raise a host of challenges to their convictions and sentences. We find no error and will affirm on all fronts. In doing so, we hold that the Sixth Amendment does not categorically forbid stipulating to a crime's jurisdictional element without the defendant's consent or over the defendant's objection. Though contesting or conceding guilt is for criminal defendants to decide, their lawyers may decide whether to contest or concede a crime's jurisdictional element.

## I. BACKGROUND

Wilson's and Moore's convictions stem from two bank robberies in November 2013. On November 4, three men robbed a Wells Fargo branch in Bala Cynwyd, Pennsylvania. The men entered the bank with what looked like a semiautomatic handgun and took roughly $81,000. A bank employee named Calia Kane later admitted to assisting the robbers.

The next morning, Wilson, Moore, and Martril Foster were pulled over while driving a rental car southbound on I-85 in North Carolina. After Wilson, the driver, said they were driving to Georgia and admitted that they had a lot of cash in the car, the officer suspected that the men were going to buy drugs

3

in Atlanta. He searched the car, found the stolen cash, seized it, and turned it over to federal drug agents. Afterward, the officer released the three men.

About a week later, three men showed up at another Wells Fargo branch in Phoenixville, Pennsylvania. But the bank was closed for Veterans Day, so the men tried again the next day. This time the bank was open, and the men got away with roughly $70,000.

The police later got a tip from Lester Howell, a man whom Wilson had tried to recruit for the heists, about the first bank robbery. Howell gave the police a cell phone number of one of the robbers. The police traced that number to Wilson and pulled his cell-site location data, which put him at the scene of the Bala Cynwyd branch right before the first robbery. The data also showed five calls and seventeen text messages to and from Kane, the bank employee, that same day. And Howell identified Wilson and Moore from a video of the robbery.

Because of the similarities in the two robberies, police suspected that they involved the same perpetrators. Wilson, Moore, Foster, and Kane were charged for their roles in both. Kane and Foster took plea bargains and cooperated with the police.

Wilson and Moore were tried jointly for two counts of bank robbery, conspiracy, and two counts of using a firearm in furtherance of a crime of violence. At trial, Wilson conceded that he had been one of the robbers and instead challenged whether the gun used was real. Moore maintained his innocence. Both men were convicted on all counts. The District Court sentenced

Moore to 385 months' imprisonment, one month more than the mandatory-minimum sentence for his gun charges. Wilson received 519 months, the top of his Sentencing Guidelines range.

Both men now appeal. The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## II. COUNSEL'S STIPULATION THAT THE BANKS WERE FEDERALLY INSURED DID NOT VIOLATE THE SIXTH AMENDMENT

We start with the Sixth Amendment claim, as it is one of first impression in our Circuit. Wilson argues that his counsel violated his right to put on the defense of his choice by stipulating that both Wells Fargo branches were federally insured. If a defendant robs a federally insured bank, that insurance gives prosecutors a jurisdictional hook to charge him with federal bank robbery under 18 U.S.C. § 2113(a) and (f). So counsel's stipulation to this fact satisfied the jurisdictional element of federal bank robbery. Wilson says the stipulation was therefore "tantamount to a guilty plea." Wilson Br. 37. Moore phrases the same argument differently, objecting that he was never advised of, and never consented to, his counsel's stipulation.

We disagree. We hold that a defendant need not consent to a jurisdictional stipulation. Even if a lawyer stipulates to a crime's jurisdictional element without getting his client's consent or over his client's objection, that stipulation does not per se violate a criminal defendant's Sixth Amendment right to counsel.

5

## A. Criminal defendants have the right to dictate the objectives of their defense and to make fundamental decisions

When a criminal defendant challenges his counsel's tactical choices, we usually analyze that challenge under the two-prong test of *Strickland v. Washington*, 466 U.S. 668, 687 (1984). But when a defendant is deprived of counsel entirely, the error is structural and the defendant gets a new trial. *See Gideon v. Wainwright*, 372 U.S. 335, 340–42 (1963). Likewise, when a defendant insists on representing himself, denying his right to do so is structural. *McKaskle v. Wiggins*, 465 U.S. 168, 177–78 & n.8 (1984). So too is denying a defendant the right to retain counsel of his choice. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006). Thus, "[t]he Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Faretta v. California*, 422 U.S. 806, 819 (1975).

The Sixth Amendment respects a defendant's right to counsel and right to autonomy by dividing ultimate decisionmaking authority between lawyer and defendant. Lawyers control tactics, while defendants get to set big-picture objectives. For tactical decisions, like which arguments to press and what objections to raise, the lawyer calls the shots. *See Gonzalez v. United States*, 553 U.S. 242, 248–49 (2008) (citing *New York v. Hill*, 528 U.S. 110, 114–15 (2000)). But fundamental decisions belong to the defendant alone: whether to plead guilty, waive a jury trial, testify, or appeal. *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

Recently, in *McCoy v. Louisiana*, the Supreme Court clarified the line between tactical and fundamental decisions. *See* 138 S. Ct. 1500, 1507–08 (2018). On the one hand, "strategic choices about how best to *achieve* a client's objectives" are decisions for lawyers, so we review them for ineffectiveness. *Id.* at 1508. On the other hand, "choices about what the client's objectives in fact *are*" belong to defendants themselves, and violating a defendant's right to make those choices is structural error. *Id.*

In *McCoy*, the defendant was charged with murdering three relatives of his estranged wife and faced a possible death sentence. 138 S. Ct. at 1505–06. His counsel wanted to concede guilt and argue for mercy at sentencing. *Id.* at 1506 & n.2. But the defendant insisted on contesting guilt; he demanded that counsel instead advance a conspiracy theory that he was being framed by crooked state and federal officials. *See id.* at 1513 (Alito, J., dissenting). Counsel ignored that demand and conceded before the jury that McCoy had killed the victims. *Id.* at 1506–07 (majority opinion).

The Supreme Court vacated McCoy's convictions. The Sixth Amendment, it held, guarantees defendants the "[a]utonomy to decide that the objective of the defense is to assert innocence." 138 S. Ct. at 1508. Violation of that right is structural error. *Id.* at 1511. The Court observed that a defendant "may wish to avoid, above all else, the opprobrium that comes with admitting he killed family members." *Id.* at 1508. So "[w]hen a client expressly asserts that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override

7

it by conceding guilt." *Id.* at 1509 (quoting U.S. Const. amend. VI). Yet the Court did not explain what kinds of concessions count as "conceding guilt." That is the issue here.

### B. Whether to contest a crime's jurisdictional element is not a fundamental decision reserved for the defendant

Wilson argues that under *McCoy*, his counsel's stipulation to the jurisdictional element violated his Sixth Amendment rights. But this case is different from *McCoy*. For one, counsel did not override his client's expressed wishes. There is no evidence that either defendant objected to the stipulation or demanded that counsel not concede this element of the crime. Appellants argue only that counsel should have consulted with them or that the District Court should have advised them about it. True, the stipulation was in some sense contrary to Wilson's asserted "objective … to contest the charges against him" generally, and to Moore's decision to challenge his guilt "in all respects." Wilson Br. 37; Moore Br. 39. But neither can show that he "expressly assert[ed]," and that counsel ignored, a specific demand to fight the jurisdictional element. *McCoy*, 138 S. Ct. at 1509.

Even if appellants had instructed counsel to fight the jurisdictional element, two more basic factors would distinguish *McCoy*. First, that case was about conceding factual guilt: McCoy claimed that he had not killed the victims. While maintaining one's innocence or trying to minimize punishment is a fundamental objective of the defense, litigating the jurisdictional element is but a technical, tactical *means* to achieve that

objective. Second, jurisdictional elements trigger no "opprobrium" or stigma. *McCoy*, 138 S. Ct. at 1508. In fact, they typically have nothing to do with the defendant. Whether the Wells Fargo branches were federally insured is quite separate from Wilson's or Moore's conduct, mental states, or involvement in the robberies. So conceding the jurisdictional element cast no stigma upon them.

In sum, whether to contest or concede a jurisdictional element is a tactical decision reserved for counsel, not defendants. This is why *McCoy* distinguished counsel's concession of factual guilt from a "strategic" decision "to concede an element of a charged offense." 138 S. Ct. at 1510. Here, counsel made the latter choice. And by conceding jurisdiction, counsel has not "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 659 (1984). Of course, counsel always retains the ethical responsibility to consult with the defendant about how to achieve the defendant's goals. *See, e.g.*, Model Rules of Prof'l Conduct r. 1.4(a)(2). But failure to consult with the defendant on the stipulation or to heed his instruction to contest a jurisdictional element, while perhaps ethically worrisome, is not structural error. We express no view about whether counsel's decision here met *Strickland*'s two-part test for effective assistance of counsel.

### III. THE FOURTH AMENDMENT CLAIMS FAIL

Next, we turn to a pair of suppression claims, both of which fail.

### A. The traffic stop did not violate the Fourth Amendment

Wilson and Moore sought to suppress the evidence seized from their rental car in North Carolina. Moore argues that the initial stop was improper. And both claim that the police officer impermissibly extended the stop before he found the evidence. The District Court denied their motions to suppress. We agree and will affirm that ruling.

We review the District Court's factual findings for clear error and its application of law to those facts de novo. *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006). Our review of the facts is aided by the dashcam video from Officer Joshua Freeman's patrol car, which is in the record and lasts the duration of the traffic stop.

1. *There was reasonable suspicion to support the traffic stop.* Moore first argues that any evidence from the traffic stop should have been suppressed because the stop was pretextual and not supported by probable cause. But traffic stops require only reasonable suspicion, not probable cause. *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012). And pretext is irrelevant: "[T]he Supreme Court [has] established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *Mosley*, 454 F.3d at 252 (citing *Whren v. United States*, 517 U.S. 806 (1996)).

Officer Freeman had reasonable suspicion that the driver had broken traffic laws. He testified at the suppression hearing that he saw the car speeding, changing lanes without signaling, and tailgating the car in front of it. The District Court credited this testimony. And we can see the tailgating violation for ourselves on the video. All of these violate North Carolina traffic law. *See* N.C. Gen. Stat. §§ 20-141(a)–(b), (d); 20-152(a), 20-154(a), (b). So there was reasonable suspicion to justify the stop.

2. *Officer Freeman did not impermissibly prolong the stop.* A traffic stop may last as long as needed to "to address the traffic violation that warranted the stop and attend to related safety concerns." *United States v. Clark*, 902 F.3d 404, 409–10 (3d Cir. 2018) (quoting *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015)). Beyond that point, the officer must have reasonable suspicion to prolong the stop and investigate further. *Id.* at 410. Here, the officer did.

Within minutes, Officer Freeman learned suspicious facts that gave him cause to investigate further. When he first pulled the car over and asked Wilson for his license and registration, Wilson explained that it was a rental car. Freeman asked Wilson to get out of the car. While Wilson was exiting, Freeman peered through the hatchback into the trunk area and noticed that there was no luggage.

The rest of Officer Freeman and Wilson's conversation took place in the front of Freeman's cruiser. Freeman explained the traffic violations that he had witnessed. Wilson then volunteered that he was driving from Philadelphia to Georgia for his uncle's funeral, that he was tired, and that he

11

planned to stay for a week. During this exchange, Freeman kept communicating with dispatch while checking Wilson's license and the rental-car information. He learned that Wilson's name was not on the rental agreement and that the day before, the car had been rented for one month. This all happened within about four minutes.

Officer Freeman then went to talk with Moore and Foster, who were still in the rental car. They said they had been traveling all night to Atlanta to see their brother and that they planned to stay for a week, but said nothing about a funeral. When Freeman asked why they had no luggage, they answered that they would just buy what they needed in Georgia. Freeman asked Wilson the same question and got the same answer. Wilson also admitted that he had a juvenile drug arrest.

Next, Officer Freeman confronted Wilson with his suspicions that Wilson and his passengers were lying about the real reason for their trip. Freeman told Wilson that he did not buy his story about his uncle's funeral. And he asked how much cash was in the car. Wilson hesitated before finally admitting that he thought there was roughly $20,000.

We can hit pause on the story right there. At this point, less than ten minutes had elapsed since Officer Freeman had pulled over Wilson's car. As Freeman had not heard back from dispatch with information about Wilson and the rental car, the stop was still justified for traffic enforcement. *See Rodriguez*, 135 S. Ct. at 1614–15. By then, Freeman had learned more than enough to establish reasonable, articulable suspicion that the three men were trafficking drugs: They were driving through North Carolina in a rental car they had picked up the day before

12

in Philadelphia, but the person named in the rental agreement was not in the car. They said they were going to Georgia for a week, but the car was rented for a month and they had no luggage. They gave conflicting stories about their trip's purpose. And Wilson confessed to having a lot of cash in the car. Especially given Freeman's extensive experience interdicting drugs, his suspicion was objectively reasonable. *See United States v. Arvizu*, 534 U.S. 266, 273–74 (2002). Thus, by the time Freeman extended the stop to investigate other crimes, he had more than enough evidence "to establish reasonable suspicion that [the passengers] w[ere] involved in drug trafficking." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (citing *Rodriguez*, 135 S. Ct. at 1615).

3. *Wilson and Moore forfeited the argument that Wilson's consent was invalid.* After Officer Freeman gave Wilson a written warning, Wilson consented to a search of the rental car. Only then did Freeman discover the stolen cash. In the District Court, Wilson and Moore challenged the voluntariness of that consent, but the court found that it was voluntary. On appeal, Wilson and Moore allude to this issue in passing but do not press it. Thus, they have forfeited this issue. So we need not decide whether Wilson's consent was valid. *See, e.g.*, *Sikirica v. Wettach (In re Wettach)*, 811 F.3d 99, 115 (3d Cir. 2016) (appellants forfeited an argument by "fail[ing] to develop" it before the court of appeals).

## B. Use of the cell-site location data was proper under the good-faith exception

Wilson and Moore also argue that, at trial, the Government improperly introduced cell-site location information about

13

Wilson's cell phone. In 2014, the Government got a court order compelling production of that data under a statute that did not require a search warrant. *See* 18 U.S.C. § 2703(d). At the time, our precedent approved of this practice, permitting cell-site orders without probable cause. *See In re Application of the U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to the Gov't*, 620 F.3d 304, 313 (3d Cir. 2010). Years later, the Supreme Court abrogated that precedent, holding that these cell-site searches require a warrant supported by probable cause. *Carpenter v. United States*, 138 S. Ct. 2206, 2217–21 (2018). So Wilson and Moore argue that Wilson's cell-site location information should have been suppressed.

Not so. After Wilson and Moore filed their briefs, we held that cell-site location information gathered under § 2703(d) before *Carpenter* is protected by the good-faith exception to the exclusionary rule. *United States v. Goldstein*, 914 F.3d 200, 204 (3d Cir. 2019). Relying on a § 2703(d) order was objectively reasonable at the time. *Id.* And there is no claim that the Government violated the procedures required by § 2703(d). *Id.* So the evidence was admissible.

## IV. THE DISTRICT COURT DID NOT ERR IN ITS DISCRETIONARY TRIAL-MANAGEMENT DECISIONS

Next, Moore challenges the District Court's failure to sever the two codefendants' joint trial as well as its failure to grant a mistrial after a witness mentioned that Wilson and Moore had a history of drug dealing. These discretionary decisions were both proper.

14

## A. The District Court did not commit plain error by failing to sever the trial

In a move that Moore calls "[u]nexpected[ ]" and a "surprise," Wilson's counsel conceded at trial that Wilson had in fact robbed both banks. Moore Br. 48–49. By contrast, Moore's trial strategy was to deny any involvement. Wilson's concession undermined that strategy by bolstering the testimony of cooperators whom Moore needed to discredit. So Moore argues that the District Court should have severed the two defendants' trials right then and there.

Moore's burden is extremely heavy. Because he did not ask for a severance at the time, we review the District Court's failure to do so sua sponte for plain error. *United States v. Hart*, 273 F.3d 363, 369–70 (3d Cir. 2001). And plain-error review or not, "[i]t is not enough to show that severance would have increased the defendant's chances of acquittal." *United States v. McGlory*, 968 F.2d 309, 340 (3d Cir. 1992). A defendant must always "pinpoint 'clear and substantial prejudice'" arising from the failure to sever and "resulting in an unfair trial." *Id.* (quoting *United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir. 1991)).

Moore cannot carry this burden. The risk of prejudice here was weaker than in a case in which codefendants present mutually antagonistic defenses: Wilson conceded his own involvement, but the jury could still have found insufficient evidence that Moore was involved with him. And severance is strong medicine. Even in a case of antagonistic defenses, severance is not automatically required. *See Zafiro v. United*

*States*, 506 U.S. 534, 538 (1993). Instead, we "leave[ ] the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Id.* at 538–39.

The District Court exercised that discretion here. It reminded the jury that counsel's statements were not evidence and that the jury would have to decide each defendant's guilt individually. "We presume that the jury follows such instructions, and regard such instructions as persuasive evidence that refusals to sever did not prejudice the defendant." *United States v. Bornman*, 559 F.3d 150, 156 (3d Cir. 2009) (quoting *United States v. Urban*, 404 F.3d 754, 776 (3d Cir. 2005)). That presumption is a strong one, and Moore points to nothing special here to overcome it.

### B. The District Court did not abuse its discretion by denying a mistrial after a witness mentioned Wilson and Moore's drug dealing

Moore also argues that the District Court should have granted a mistrial after a witness unexpectedly mentioned his history of drug dealing. According to the prosecution, it had warned Foster, one of the cooperating coconspirators, not to mention Wilson and Moore's history of dealing drugs. Yet when asked how he knew Wilson and Moore, Foster testified that "we used to sell drugs together." Wilson App. 1218. The defense immediately moved for a mistrial, which the District Court denied. We review that denial for abuse of discretion. *United States v. Bailey*, 840 F.3d 99, 131 n.153 (3d Cir. 2016).

Witnesses often let slip improper evidence. Usually, the solution is a curative instruction telling the jury to disregard what

16

it should not have heard. We presume that the jury will follow this instruction, unless we see an "'overwhelming probability'" that it will not and "a strong likelihood" that the improper evidence "would be 'devastating' to the defendant." *United States v. Gonzalez*, 905 F.3d 165, 198 (3d Cir. 2018) (quoting *United States v. Newby*, 11 F.3d 1143, 1147 (3d Cir. 1993)).

Here, the District Court gave a curative instruction promptly. It told the jury to "[d]isregard the comment about selling drugs," clarified that the trial was about bank robberies and guns rather than drugs, and warned the jury that "we're not going to either determine or be distracted by anything else." Wilson App. 1218–19. The court also clarified that Foster's statement "has no evidentiary value." Wilson App. 1219.

Nor is this the sort of inadvertent slip that would irrevocably taint the jury. Foster said nothing about robbing banks or using guns. Drug dealing is unrelated to bank robbing and has only an indirect connection to gun toting. Given the immediate and clear curative instruction, this isolated comment would not have been "devastating." *Gonzalez*, 905 F.3d at 198 (quoting *Newby*, 11 F.3d at 1147). So the District Court did not abuse its discretion by denying a mistrial.

## V. THE GOVERNMENT DID NOT MAKE IMPROPER STATEMENTS AT TRIAL

Moore also challenges three of the prosecutor's statements in his closing argument. These challenges fail too.

Moore argues that in the prosecutor's closing arguments, he vouched for the prosecution's own credibility and the credibility of its witnesses. To show improper vouching, the defendant

17

must prove that the prosecutor did two things: first, that he "assure[d] the jury that the testimony of a government witness is credible," and second, that he explicitly or implicitly "base[d] his assurance on either his claimed personal knowledge or other information not contained in the record." *United States v. Lore*, 430 F.3d 190, 211 (3d Cir. 2005). A defendant must show that a comment refers, explicitly or implicitly, to "the prosecutor's [own] personal knowledge" or to "other information not contained in the [trial] record." *United States v. Walker*, 155 F.3d 180, 187 (3d Cir. 1998).

Three statements are at issue. Because Moore objected to the first of these statements, we review the District Court's decision to allow that statement for abuse of discretion. *United States v. Vitillo*, 490 F.3d 314, 325 (3d Cir. 2007). But because he did not object to the other two statements, we review those for plain error. *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006). In context, none of the three challenged statements was improper.

First, the prosecutor argued that even though cooperators like Kane and Foster "have a motive to lie, … [w]e take necessary precautions to ensure that if anybody's going to get on that stand and testify, they better darn well be telling the truth." Wilson App. 1441–42. The District Court overruled Wilson's objection. The prosecution immediately clarified to the jury: "It's the plea agreement that I'm referring to …. They're terms that [Kane and Foster are] bound by. The only way that they could help themselves here, ladies and gentlemen, is by telling the truth. That's their only hope." Wilson App. 1442.

18

Kane's and Foster's plea agreements had been introduced into evidence. So in context, the prosecutor was not suggesting that he knew something the jury did not. He was arguing that the jury should conclude from the plea agreements that Kane and Foster had everything to lose and nothing to gain by lying. So the District Court did not abuse its discretion in letting the prosecutor make this argument. *See United States v. Saada*, 212 F.3d 210, 225–26 (3d Cir. 2000).

Soon after that, the prosecution added a second statement: "The defense would have you believe that [Kane and Foster are] not credible because they would come in here and lie just to try and get a reduced sentence. In order for you to believe that, ladies and gentlemen, you have to believe that we are a bunch of idiots." Wilson App. 1444. That statement was unfortunate, but he immediately continued: "If you want to believe that, that's up to you, but nothing that you've seen in this courtroom would lead you to that conclusion." *Id.* Allowing that statement was not error, let alone plain error. The prosecution was merely commenting on the weakness of the defense's theory that Kane and Foster were lying. And the prosecutor explicitly said it was up to the jury to decide who was telling the truth, based on what "you've seen in this courtroom." *Id.*

The same goes for the third statement, which the prosecutor made in rebuttal. He said he was "surprised to hear" the defense's theory that "we're somehow complicit in this plan to turn the tables on these two guys and have you find them guilty when they're—at least Moore, when he's really not." Wilson App. 1500. After mentioning four agents who investigated the robbery and testified, the prosecutor asked: "Do you think we

19

all put blinders on and, when we saw the information provided by Kane and Foster when they first talked to police and … there was no gun mentioned," that the prosecution "wanted there to be a gun so bad that we got them to change their story and didn't let them plead guilty until they told us it was a gun? Do you believe that for a minute, ladies and gentlemen? You have no reason to believe that." Wilson App. 1500–01.

In context, the prosecutor was commenting on what the jury would have to believe to accept the defense's theory: that several Government witnesses were lying and that the Government had coerced Kane and Foster to lie about a gun. The prosecution had the right to argue that the jury "ha[d] no reason to believe that" theory because, in its view, there was simply no evidence in the record to support the defense's theory. Wilson App. 1501. So the District Court's decision to allow these statements was not error, let alone plain error.

## VI. THE EVIDENCE WAS SUFFICIENT TO SUSTAIN THE CONVICTIONS

Next, both Wilson and Moore challenge the sufficiency of the evidence that the bank branches were federally insured. Moore makes two additional arguments: He challenges the evidence of his involvement in the conspiracy and the robberies. He also challenges the evidence that the gun used in the robberies was real.

Our review is highly deferential. We cannot disturb the jury's factual findings if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

20

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On this record, all three challenges fail.

### A. The stipulation established the jurisdictional element

Appellants' first challenge is groundless. The Government introduced a certificate evidencing the federal insurance of "Wells Fargo Bank, N.A.," the national parent company covering all the branches. Wilson App. 1651. And both defendants' counsel stipulated that both branches were federally insured. A stipulation can establish an element of a crime. *See Old Chief v. United States*, 519 U.S. 172, 186 (1997) (citing Fed. R. Evid. 801(d)(2)(A)).

Appellants fall back on objecting that the stipulation was not in writing, that they were never advised on it by counsel or the District Court, and that they did not understand what was going on. But these objections say nothing about whether there was enough evidence. There was. The most we can make of this argument is a rehash of the Sixth Amendment claim. And as we explained above, whether to stipulate to a jurisdictional element is a tactical decision left to counsel's professional judgment.

### B. There was sufficient evidence that Moore was involved in the crimes

Moore next challenges the sufficiency of the evidence that he took part in the robberies. He highlights the lack of physical evidence and the Government's reliance on cooperators' testimony. And he notes evidence that all three robbers were about the same height, while Wilson and Foster are six to nine inches

taller than he is. He also claims that there was too little evidence that he was involved in planning the robberies to support the conspiracy charge.

But there was plenty of evidence that Moore was involved in all the crimes: Kane testified that Moore took part in planning discussions before the robberies. Kane and Foster both testified that Moore went into the banks carrying a gun. And both testified that Moore had helped pick the target of the second robbery. Moore argued to the jury that Kane and Foster were lying about his role in the robberies. But the jury could and did reject that argument. And if the jury believed Kane and Foster, it was justified in finding that Moore was part of the conspiracy.

We likewise reject Moore's argument about the height of the robbers. While some evidence suggested that the robbers' heights were similar, other witnesses reported that one robber was "short and stocky" and that the one who held the gun was "[m]edium-size[d]." Wilson App. 540–41, 672–73. It is not our job to reconcile that conflicting evidence when reviewing a cold trial record. That was for the jury.

### C. There was sufficient evidence of a real gun

Moore also challenges his conviction under 18 U.S.C. § 924(c) for using a gun during the bank robberies. He claims that the Government never proved that the gun was real, as opposed to a BB gun he owned and used as a prop in music videos. We disagree.

Several eyewitnesses in the banks testified about the gun, including one who had lifelong experience with guns. The two

22

cooperating witnesses corroborated this: Kane testified that Wilson and Moore called the gun "the .40." Wilson App. 895–96. And Foster testified that before the robberies, Wilson showed him a loaded "standard-issue Glock." Wilson App. 1231–32. Based on a video of the robbery, one agent concurred that the gun was a Glock .40 caliber, the same gun that he carried on duty. Another agent agreed. This testimony was more than enough evidence for a rational jury to find that the gun was real. *See United States v. Beverly*, 99 F.3d 570, 572–73 (3d Cir. 1996).

## VII.  BANK ROBBERY WAS PROPERLY CHARGED AND INSTRUCTED AS A "CRIME OF VIOLENCE" UNDER 18 U.S.C. §924(C)

Wilson and Moore were each convicted of two counts of brandishing a gun "during and in relation to" a "crime of violence" under 18 U.S.C. §924(c)(1)(A)(ii). They argue that their crimes are not crimes of violence under that statute, and that the jury instructions on those counts were improper. The first objection is a nonstarter. We have recently held that armed bank robbery is categorically a crime of violence under §924(c)(3)'s elements clause. *United States v. Johnson*, 899 F.3d 191, 204 (3d Cir. 2018).

Wilson and Moore's challenge to the jury instruction likewise fails. They argue that the District Court should not have instructed the jury that conspiracy (or perhaps conspiracy to commit bank robbery) counts as a crime of violence. But even if that is right, it gets them nowhere. The District Court instructed the jury that *either* conspiracy *or* armed bank robbery would count as a predicate crime for a §924(c) conviction, as

long as the jury found that the defendants had used or carried the gun to further the crime. Wilson App. 1546. The jury convicted both defendants on both bank-robbery counts. So we can tell from the verdict form, as well as from the evidence presented at trial, that there is no "reasonable possibility" that the jury based its §924(c) convictions only on the conspiracy as opposed to the bank-robbery counts. *See United States v. Duka*, 671 F.3d 329, 356 (3d Cir. 2011). Thus, even if the instruction was erroneous, any error was harmless. *See United States v. Waller*, 654 F.3d 430, 434 (3d Cir. 2011).

## VIII.  THE SENTENCES WERE PROPER

Finally, both Wilson and Moore argue that they should get the benefit of the recent First Step Act, which would lower their mandatory-minimum sentences. Wilson also argues that his prison sentence was substantively unreasonable. Neither argument succeeds.

### A.  The First Step Act's change to §924(c) is not retroactive to defendants sentenced before the Act was passed

Wilson and Moore argue that they should benefit from the First Step Act because their cases were still pending on direct appeal when it was enacted. Thus, they claim, their sentence had not really been "imposed" within the meaning of section 403(b) of the First Step Act. *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5222. But while this appeal was pending, we held that a defendant whom a district court had sentenced before the First Step Act was enacted could not

retroactively claim the benefit of section 403(b). *United States v. Hodge*, 948 F.3d 160, 162–64 (3d Cir. 2020).

Wilson and Moore also advance a new argument that we did not address in *Hodge*: that by titling section 403's amendment a "[c]larification," Congress was suggesting that it was simply conforming the text of §924(c)(1)(C)(i) to what the statute was supposed to have meant all along. But whatever the merits of these arguments, as a later panel we are bound by *Hodge*'s reading of section 403. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 177 (3d Cir. 2017). So we must reject the First Step Act argument.

## B. Wilson's sentence was substantively reasonable

The District Court sentenced Wilson to 519 months' imprisonment (43 years and three months), at the top of his Sentencing Guidelines range. Wilson does not challenge the procedures the District Court followed, but claims that sentence was substantively unreasonable. He did ask for a lower sentence, right above the 32-year mandatory minimum, so he has preserved that claim. *See Holguin-Hernandez v. United States*, 140 S. Ct. 762, 766 (2020). We review the sentence for abuse of discretion. *United States v. Azcona-Polanco*, 865 F.3d 148, 151 (3d Cir. 2017). That means "we will affirm it unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (en banc).

25

Wilson explains that even a 32-year sentence would keep him in prison until he was in his fifties. He argues that imprisoning him longer serves no valid purpose and that we should not defer to a Guidelines range where, as here, it is pegged to a mandatory minimum. But the District Court considered the requisite statutory sentencing factors set forth in 18 U.S.C. § 3553(a). In particular, it focused on general and specific deterrence and retribution, factoring in the crimes' effect on the victims and Wilson's recruiting of other participants. The Court did not defer blindly to the Guidelines; indeed, it considered both upward and downward departures. In the end, it chose the top of the Guidelines range. That decision was reasonable.

\* \* \* \* \*

Criminal defendants have a Sixth Amendment right to choose the ultimate objectives of their defense. That includes the right to maintain their factual innocence, even if their lawyers advise them to admit guilt. But their lawyers call the shots on the tactics used to achieve those objectives. Defense lawyers may thus stipulate to the jurisdictional elements of crimes without their clients' consent or over their clients' objection. Because counsels' stipulations did not violate the Sixth Amendment, and because Wilson's and Moore's other arguments fail, we will affirm their convictions and sentences.

26